**ARMSTRONG COUNTY MEMORIAL HOSPITAL and Monongahela Valley Hospital, Inc., Petitioners**

v.

**The DEPARTMENT OF PUBLIC WELFARE OF the COMMONWEALTH OF PENNSYLVANIA, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 17, 2013.

Decided May 20, 2013.

Barbara Blackmond, Pittsburgh, for petitioners.

Jason W. Manne, Deputy Chief Counsel, Pittsburgh, for respondent.

Philip H. Lebowitz and David E. Loder, Philadelphia, for intervenor Hospital & Healthsystem Association of Pennsylvania.

BEFORE: PELLEGRINI, President Judge, McGINLEY, Judge, COHN JUBELIRER, Judge, LEAVITT, Judge, BROBSON, Judge.

OPINION BY Judge BROBSON.

On July 2, 2012, Petitioners Armstrong County Memorial Hospital and Monongahela Valley Hospital, Inc. (Hospitals) commenced this action against Respondent Department of Public Welfare of the Commonwealth of Pennsylvania (DPW) by

filing a Petition for Review (Petition) addressed to this Court's original jurisdiction. By Order dated August 16, 2012, this Court granted intervenor status to the Hospital and Healthsystem Association of Pennsylvania (HAP), for purposes of allowing HAP to oppose the Hospitals' Petition. Presently before the Court for disposition are the preliminary objections of DPW and HAP to the Petition.

## I. BACKGROUND

### A. The Petition

As this Court explained more thoroughly in *Commonwealth v. TAP Pharmaceutical Products, Inc.*, 36 A.3d 1112 (Pa.Cmwlth. 2011), DPW is the state agency that administers the Commonwealth's Medicaid program. "Medicaid is a joint state-federal funded program for medical assistance in which the federal government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the state agreed to assume." *TAP*, 36 A.3d at 1122. DPW delivers Medicaid benefits in Pennsylvania through two (2) payment systems—(1) "fee-for-service," where the provider of the care is paid on a claim basis; and (2) "managed care," where an intermediary managed care organization (MCO), under contract with DPW, is paid on a monthly, fixed-fee basis per enrollee. *Id.* at 1123. Because under the managed care model Medicaid funds go directly to the MCO and not to the provider of the healthcare service, the MCO pays the provider pursuant to the terms of an agreement between the MCO and the provider.

As alleged in the Petition, Hospitals have provider agreements with DPW to provide health care services to patients covered under the managed care portion of DPW's Medicaid program. Consequently, Hospitals also have contracts with certain MCOs, through which Hospitals are paid for the services they provide to the managed care Medicaid recipients.

In their Petition, Hospitals challenge certain aspects of the implementation of the Act of July 9, 2010, P.L. 336 (Act 49).[1] Act 49 amended the Public Welfare Code, Act of June 13, 1976, P.L. 31, *as amended*, 62 P.S. §§ 101–1503 (Code). Relevant to this action are Section 443.1 of the Code, 62 P.S. § 443.1, and Article VIII–G of the Code, 62 P.S. §§ 801–G—816–G, as they apply to the managed care side of the DPW Medicaid program.

Section 443.1(1.1) of the Code, which was amended by Act 49 and also amended thereafter, addresses, *inter alia*, payment methods and standards by which DPW is to calculate payments to acute care hospitals for inpatient services provided on or after July 1, 2010, on a fee-for-service basis. One of those methods and standards is a requirement that DPW use the "All Patient Refined–Diagnosis Related Group," or APR/DRG system, for purposes of classifying inpatient stays into diagnosis related groups, or DRGs. DPW then assigns base rates to each DRG, which are then used to arrive at the appropriate fee-for-service reimbursement rates for hospitals. By its own terms, the provisions of paragraph (1.1) only apply to the Commonwealth fiscal years in which DPW imposes an assessment authorized under new Article VIII–G of the Code, added by Act 49, referred to as the Quality Care Assessment (Assessment). Under Article VIII–G, DPW is authorized to impose the Assessment for fiscal years 2010–2011,

---

1. Act 49 had a retroactive effective date of July 1, 2010, the beginning of the Commonwealth's 2010–2011 fiscal year.

2011–2012, and 2012–2013. Article VIII–G expires at the end of the 2012–2013 fiscal year (June 30, 2013). Section 815–G of the Code, 62 P.S. § 815–G.

With respect to managed care, Section 443.1(1.2) of the Code includes certain provisions governing the rates that MCOs pay hospitals. As amended by Act 49, paragraph (1.2), like paragraph (1.1), applied to every fiscal year in which DPW imposed the Assessment. Paragraph (1.2), however, has since been amended by the Act of June 30, 2011, P.L. 89, limiting the application of paragraph (1.2) to only the Commonwealth's fiscal year 2010–2011. Today, Section 443.1(1.2) provides, in relevant part:

(1.2) Subject to section 813–G, for inpatient acute care hospital services provided under the physical health medical assistance managed care program during State fiscal year 2010–2011, the following shall apply:

(i) For inpatient hospital services provided under a participation agreement between an inpatient acute care hospital and a medical assistance managed care organization in effect as of June 30, 2010, the medical assistance managed care organization shall pay, and the hospital shall accept as payment in full, amounts determined in accordance with the payment terms and rate methodology specified in the agreement and in effect as of June 30, 2010, during the term of that participation agreement. If a participation agreement in effect as of June 30, 2010, uses the department fee for service DRG rate methodology in determining payment amounts, the medical assistance managed care organization shall pay, and the hospital shall accept as payment in full, amounts determined in accordance with the fee for service payment methodology in effect as of June 30, 2010, including, without limitation, continuation of the same grouper, outlier methodology, base rates and relative weights, during the term of that participation agreement.

(ii) Nothing in subparagraph (i) shall prohibit payment rates for inpatient acute care hospital services provided under a participation agreement to change from the rates in effect as of June 30, 2010, if the change in payment rates is authorized by the terms of the participation agreement between the inpatient acute care hospital and the medical assistance managed care organization. For purposes of this act, any contract provision that provides that payment rates and changes to payment rates shall be calculated based upon the department's fee for service DRG payment methodology shall be interpreted to mean the department's fee for service medical assistance DRG methodology in place on June 30, 2010.

(iii) If a participation agreement between a hospital and a medical assistance managed care organization terminates during a fiscal year in which an assessment is imposed under Article VIII–G prior to the expiration of the term of the participation agreement, payment for services, other than emergency services, covered by the medical assistance managed care organization and rendered by the hospital shall be made at the rate in effect as of the termination date, as adjusted in accordance with subparagraphs (i) and (ii), during the period in which the participation agreement would have been in effect had the agreement not terminated. The hospital shall receive the supplemental payment in accordance with subparagraph (v).

(iv) If a hospital and a medical assistance managed care organization do not have a participation agreement in effect as of June 30, 2010, the medical assistance managed care organization shall pay, and the hospital shall accept as payment in full, for services, other than emergency services, covered by the medical assistance managed care organization and rendered during a fiscal year in which an assessment is imposed under Article VIII–G, an amount equal to the rates payable for the services by the medical assistance fee for service program as of June 30, 2010. The hospital shall receive the supplemental payment in accordance with subparagraph (v).

(v) The department shall make enhanced capitation payments to medical assistance managed care organizations exclusively for the purpose of making supplemental payments to hospitals in order to promote continued access to quality care for medical assistance recipients. Medical assistance managed care organizations shall use the enhanced capitation payments received pursuant to this section solely for the purpose of making supplemental payments to hospitals and shall provide documentation to the department certifying that all funds received in this manner are used in accordance with this section. The supplemental payments to hospitals made pursuant to this subsection are in lieu of increased or additional payments for inpatient acute care services from medical assistance managed care organizations resulting from the department's implementation of payments under para-graph (1.1)(ii). Medical assistance managed care organizations shall in no event be obligated under this section to make supplemental or other additional payments to hospitals that exceed the enhanced capitation payments made to the medical assistance managed care organization under this section. Medical assistance managed care organizations shall not be required to advance the supplemental payments to hospitals authorized by this subsection and shall only make the supplemental payments to hospitals once medical assistance managed care organizations have received the enhanced capitation payments from the department.

(vi) Nothing in this subsection shall prohibit an inpatient acute care hospital and a medical assistance managed care organization from executing a new participation agreement or amending an existing participation agreement on or after July 1, 2010, in which they agree to payment terms that would result in payments that are different than the payments determined in accordance with subparagraphs (i), (ii), (iii) and (iv).

As noted above, Act 49 also amended the Code to authorize DPW to impose the Assessment on covered hospitals.[2] Section 802–G of the Code, 62 P.S. § 802–G. Each covered hospital's assessment is calculated by applying a fixed percentage to the hospital's net inpatient revenue. Section 803–G of the Code, 62 P.S. § 803–G. Though the statutory language is somewhat convoluted, the apparent purpose of the Assessment was to generate funds that would be

2. Pursuant to Section 801–G of the Code, a "covered hospital" is "[a] facility licensed as a hospital under 28 Pa.Code Pt. IV Subpt. B (relating to general and special hospitals" that is not exempt.) Section 801–G of the Code exempts federal veterans' affairs hospitals, hospitals that provide care free of charge, private psychiatric hospitals, state-owned psychiatric hospitals, critical access hospitals, and long-term acute care hospitals.

used to augment payments to hospitals that provide services to medical assistance patients, either by direct payment under the fee-for-service side of the program or indirectly by enhanced capitation payments to MCOs, which, in turn, would provide supplemental payments to their contracted hospitals. Sections 443.1(1.1)-(1.2), 802–G of the Code.

The implementation of these augmented reimbursement provisions is dependent on the authority of DPW to impose the Assessment under both state and federal law. Although Act 49 provided DPW with the state authority to impose the Assessment, it was necessary for DPW to also secure approval of the Assessment as a permitted "health care-related tax" from the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services (CMS). *See* 42 C.F.R. Pt. 433, Subpt. B; Sections 443.1(1.1)(ii), 803–G(a), 807–G of the Code. (Pet.¶ 18.)

In their Petition, Hospitals allege that while Act 49 was under consideration, DPW entered into a July 6, 2010 letter agreement with HAP (DPW/HAP Letter Agreement), outlining HAP's role in DPW's efforts to secure CMS approval for changes to the state's Medicaid plan (State Plan) in order to implement Act 49. (Pet. ¶ 17; Affidavit Ex. 3.)[3] Hospitals allege

that a key part of the State Plan amendments was a requirement that MCOs pass enhanced capitation payments on to their contracted hospitals. They further allege that DPW knew CMS prohibited such a requirement. (Pet.¶ 19.)

Hospitals allege that while the State Plan amendments were pending before CMS, HAP sent a letter of intent to all hospitals in Pennsylvania, apparently seeking their agreement to the plan set forth in the DPW/HAP Letter Agreement with respect to a "mitigation strategy." This strategy sought to minimize harm to those hospitals that might see larger assessments than their net gain in additional payments under the DPW Medicaid program. (Pet. ¶ 20; Affidavit Ex. 4.) Hospitals refused to sign the letter of intent. (Pet.¶ 21.)

DPW ultimately received approval from CMS to implement Act 49, particularly the scheme for supplemental/enhanced payments to hospitals through the imposition of the Assessment and the migration to the APR/DRG system. (Pet. ¶ 23; Affidavit Exs. 5 & 6.) CMS, however, would not allow DPW to direct the MCOs on how to distribute the enhanced capitation payments called for in Act 49, because CMS determined that such a scheme would violate 42 C.F.R. § 438.60.[4] (Pet.¶ 24.) In-

---

**3.** DPW's first preliminary objection claimed that Hospitals failed to comply with the Pennsylvania Rules of Civil Procedure by failing in several instances to attach writings to their Petition. *See* Pa. R.C.P. No. 1019(h), (i). In response to that preliminary objection, Hospitals filed an Affidavit with the Court. Included with the Affidavit are seven exhibits, which Hospitals relate to particular paragraphs of their Petition. As a result, DPW, in its brief in support of its preliminary objections, has withdrawn this particular preliminary objection. Because neither DPW nor HAP has objected to our treatment of the exhibits attached to the Affidavit as part of Hospitals' Petition for purposes of resolving the pending preliminary objections, we will do so. We

note, however, that the preferred course for addressing a valid preliminary objection, raising the failure to attach necessary documents to a pleading, would be to file an amended pleading pursuant to Rule 1028(c)(1) of the Pennsylvania Rules of Civil Procedure.

**4.** This section provides:

The State agency must ensure that no payment is made to a provider other than the MCO, PIHP, or PAHP for services available under the contract between the State and the MCO, PIHP, or PAHP, except when these payments are provided for in title XIX of the Act, in 42 CFR, or when the State agency has adjusted the capitation rates

stead, CMS indicated that it would only approve a plan that required MCOs to demonstrate that all of the funding they received was used to increase payments to hospitals for inpatient services and that the MCOs did not, instead, keep the additional money for themselves. (*Id.*)

In paragraph 25 of the Petition, Hospitals allege that DPW, with knowledge that CMS would not approve the State Plan amendment that dictated how the MCOs were to distribute the enhanced capitation payments to their contracted hospitals, "directed" HAP to negotiate an agreement with the Pennsylvania Coalition of Medical Assistance Managed Care Organizations ("MCO Coalition") to do just that (HAP/MCO Agreement). In paragraph 26, Hospitals allege that DPW endorsed the HAP/MCO Agreement (Affidavit Ex. 7). Hospitals further allege that the HAP/MCO Agreement, as endorsed by DPW, nullified Hospitals' ability to freely negotiate with the MCOs with whom Hospitals have contracts. (Pet.¶ 26.) In so doing, they allege that DPW "delegate[ed] to HAP the power to negotiate how the funding under this aspect of the State Plan amendment would be distributed." (*Id.*)

Hospitals contend that the HAP/MCO Agreement was a "scheme that was negotiated on behalf of DPW" and that it provides for a "disparate method of distributing the enhanced capitation payments to ... MCOs." (Pet.¶¶ 27, 29.) They claim that the plan was never published in the Pennsylvania Bulletin and that neither they nor "anyone else" had the opportunity to comment on it. (Pet.¶ 29.)

According to the Petition, on or about February 22, 2011, Hospitals received noti-

fication of their new APR–DRG base rate effective July 1, 2010, for fee-for-service medical assistance payments under Section 443.1(1.1) of the Code. (Pet.¶ 11.) They characterize the new base rate as an "increase" based on Act 49. (Pet.¶ 44.) Notwithstanding that base rate increase for fee-for-service payments, Hospitals contend that they received no corresponding benefit with respect to the managed care side of the DPW Medicaid program, attributing this to claims by the MCOs with whom they have contracts that the MCOs received no additional funding to account for increased payments to the Hospitals and/or that they were not required to recognize the increased base rate under Section 443.1(1.2)(i) of the Code. As a result, Hospitals contend that are suffering financial harm. (Pet.¶¶ 44, 49.)

Hospitals' specific legal claims are set forth in four separate counts. In Count I, Hospitals allege that the DPW/HAP Letter Agreement violated Article II, Section 1 of the Pennsylvania Constitution,[5] because it vested in HAP ratemaking authority that only DPW could exercise. In Count II, Hospitals allege that DPW violated the State Plan amendments as approved by CMS by "implementing" the HAP/MCO Agreement.

In Count III, Hospitals allege that the implementation of the HAP/MCO Agreement violates 42 C.F.R. § 433.68, specifically referring to this section as a "hold harmless" provision. This section provides for the conditions under which a state may impose a health care-related tax without losing its federal funding, referred to as "FFP" (federal financial participation), un-

---

paid under the contract, in accordance with § 438.6(c)(5)(v), to make payments for graduate medical education.
42 C.F.R. § 438.60.

5. Article II, Section 1 of the Pennsylvania Constitution provides: "The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."

der the Medicaid program. Section 433.68 includes criteria that a state-imposed tax must meet to qualify as a permissible health care-related tax. To qualify, the tax must meet the following criteria:

(1) The taxes are broad based, as specified in paragraph (c) of this section;

(2) The taxes are uniformly imposed throughout a jurisdiction, as specified in paragraph (d) of this section; and

(3) The tax program does not violate the hold harmless provisions specified in paragraph (f) of this section.

42 C.F.R. § 433.68(b). According to the allegations in the Petition and in Hospitals' brief in opposition to the preliminary objections, and notwithstanding Hospitals' reference to Section 433.68 as a "hold harmless" provision, the gist of Hospitals' argument in Count III of the Petition is that the Assessment, as implemented, is not "uniformly imposed," in violation of Section 433.68(b)(2) of the regulation (and not paragraph (f), the hold harmless provision of the regulation). (Pet. ¶¶ 34, 61; Hospitals' Br. at 14–17.)

In Count IV, Hospitals claim that Act 49, as implemented by DPW's alleged delegation to HAP to enter into the HAP/MCO Agreement, unconstitutionally impairs Hospitals' ability to contract with MCOs under the Medicaid program in violation of Article I, Section 17 of the Pennsylvania Constitution.[6] In support of this argument, Hospitals allege that their contracts with MCOs provide that Hospitals' compensation from the MCOs is based on the DPW approved fee-for-service base rates. They allege further that the contracts include "acceleration" clauses, which provide that the rates paid by the MCOs will increase whenever DPW upwardly adjusts the fee-for-service base rates. (Pet. ¶ 43.)

Despite the increase in Hospitals' base rates as a result of Act 49, however, the MCOs have refused to upwardly adjust their payments to the Hospitals, relying, *inter alia*, on Section 443.1(1.2)(i) of the Code. (Pet. ¶ 44.) Hospitals, therefore, contend that this portion of the Code is unconstitutional.

With respect to all counts in the Petition, Hospitals seek declaratory relief, declaring that (a) DPW impermissibly delegated "ratemaking authority" to HAP to negotiate with the MCO Coalition in violation of Article II, Section 1 of the Pennsylvania Constitution; (b) that the implementation of the Act 49 amendments to the Code violate federal law and the terms of the CMS approval of the State Plan amendments and is, therefore, invalid; and (c) that the implementation of the Act 49 amendments to the Code prohibits Hospitals from negotiating contracts with MCOs in violation of Article I, Section 17 of the Pennsylvania Constitution. Hospitals also seek a permanent injunction, enjoining DPW from levying the Assessment and making distributions accordingly. Finally, Hospitals ask that we issue a writ of mandamus, compelling DPW to provide appropriate funding and direction to the MCOs participating in the state Medicaid program, which would require the MCOs to pay Hospitals based on the new APR–DRG base rates adopted pursuant to the Act 49 amendments to the Code. Hospitals also seek an award of attorneys' fees and costs.

### B. The Preliminary Objections

#### 1. DPW

DPW argues that the Court should dismiss Hospitals' Petition because Hospitals

---

**6.** Article I, Section 17 of the Pennsylvania Constitution provides: "No *ex post facto* law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed."

have an adequate remedy at law and/or have failed to exhaust their administrative remedies. Pa. R.C.P. No. 1028(a)(6), (7), (8). DPW points specifically to Hospitals' appeal of their new fee-for-service base rates ("Base Rate Appeal"). DPW contends that Hospitals should have raised the claims set forth in their Petition in the Base Rate Appeal or, alternatively, should have initiated a separate administrative proceeding.

DPW also argues that Count III of Hospitals' Petition is, in effect, a challenge to their assessment by DPW as a result of Act 49. DPW attaches to its preliminary objections as Exhibit A a December 29, 2010 letter from CMS, granting DPW a waiver approval ("CMS Waiver Letter"), in which CMS purports to conclude that the Assessment is generally redistributive and not correlated to Medicaid payments. DPW notes that under Section 810–G of the Code, 62 P.S. § 810–G, covered hospitals have a statutory remedy to challenge the amount of their assessment. It further claims that the decision of DPW to impose the Assessment is not subject to judicial review. Pa. R.C.P. No. 1028(a)(4) (demurrer). But assuming it is, DPW contends that Hospitals must use their statutory remedy under Section 810–G of the Code to pursue their claims. Pa. R.C.P.

No. 1028(a)(7) (failure to exhaust statutory remedy).[7]

### 2. HAP

All of HAP's preliminary objections are in the nature of a demurrer. With respect to Count I, HAP claims that the DPW/HAP Letter Agreement upon which the constitutional challenge is based was superseded by an amended January 14, 2011 Letter Agreement (Amended Letter Agreement). HAP attached the Amended Letter Agreement to its preliminary objections as Exhibit "B". HAP maintains that nowhere in either agreement does DPW give HAP any authority to redistribute monies generated by the Assessment, to negotiate and implement payments with MCOs, or to set rates.

With respect to Count II, HAP argues that the claims in that Count should fail, because although Hospitals contend that the HAP/MCO Agreement violates CMS's approval of the State Plan amendments authorizing the implementation of the Act 49 amendments to the Code, the approved State Plan amendments do not reference the alleged "pass through payment scheme" between HAP and the MCOs. Accordingly, there can be no conflict, and Count II should be dismissed.

---

7. In its brief in support of its preliminary objections, DPW argues that we should dismiss Count IV of the Petition for failure to state a claim against DPW. In reviewing DPW's filed preliminary objections, we note the absence of any preliminary objection in the nature of a demurrer directed to Count IV of the Petition. Similarly, we also note that DPW, again in its brief in support of its preliminary objections, "joins" HAP's preliminary objections in the nature of a demurrer. "All preliminary objections shall be raised at one time." Pa. R.C.P. No. 1028(b). Accordingly, in ruling on DPW's preliminary objections, we will confine our review to those issues raised by DPW in its preliminary objections filed on August 17, 2012.

In its filed preliminary objections, DPW challenged Hospitals' request for attorneys' fees in the Petition, arguing that there is no statute or rule to support such a request. Pa. R.C.P. No. 1028(a)(4) (demurrer). By Order dated September 6, 2012, we directed briefing on DPW's preliminary objections. DPW did not include any argument in its brief in support of this preliminary objection. Similarly, Hospitals do not address this particular preliminary objection in their brief in opposition. Accordingly, because neither party has briefed the issue as directed by the Court in its September 6, 2012 Order, we will overrule the preliminary objection on that basis only.

With respect to Count III, HAP points to the same CMS Waiver Letter that DPW attached to its preliminary objections. The CMS Waiver Letter is attached to HAP's preliminary objections as Exhibit C. HAP claims that the CMS Waiver Letter controverts Hospitals' claims in Count III of the Petition. Alternatively, HAP claims that Hospitals have failed to plead sufficient facts to warrant a conclusion that the restrictions in 42 C.F.R. § 433.68 are being violated. For these reasons, HAP seeks dismissal of Count III.

With respect to Count IV, HAP claims that nothing in the Act 49 amendments to the Code can be construed to impair Hospitals' contracts with MCOs. To the contrary, HAP cites to language in Section 443.1(1.2)(vi) of the Code, which HAP contends preserves the freedom of contract between hospitals and MCOs. Moreover, HAP contends that Hospitals' claim in Count IV is not based on Act 49, but rather on how the MCOs with whom Hospitals contract have interpreted Act 49. Thus, HAP argues, Hospitals' claims are more appropriately directed at the MCOs.

Finally, under the guise of a demurrer, HAP seeks dismissal of Counts II and III of the Petition, arguing that Hospitals have failed to articulate in the Petition any injury or harm that they have suffered as a result of the implementation of the HAP/MCO Agreement. Without any harm or injury, they lack standing to challenge the legality of a scheme from which they have benefitted.

## II. ANALYSIS

### A. The "Speaking Demurrer"

█ In ruling on preliminary objections, we accept as true all well-pleaded material allegations in the petition for review and any reasonable inferences that we may draw from the averments. *Meier*

*v. Maleski*, 167 Pa.Cmwlth. 458, 648 A.2d 595, 600 (1994). The Court, however, is not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the petition for review. *Id.* We may sustain preliminary objections only when the law makes clear that the petitioner cannot succeed on his claim, and we must resolve any doubt in favor of the petitioner. *Id.*

█ We review preliminary objections in the nature of a demurrer under the above guidelines and may sustain a demurrer only when a petitioner has failed to state a claim for which relief may be granted. *Clark v. Beard*, 918 A.2d 155, 158 (Pa.Cmwlth.2007). We have held that "a demurrer cannot aver the existence of facts not apparent from the face of the challenged pleading." *Martin v. Dep't of Transp.*, 124 Pa.Cmwlth. 625, 556 A.2d 969, 971 (1989). As this Court recently explained:

> [A] court cannot consider matters collateral to the complaint, but must limit itself to such matters as appear therein, and an effort to supply facts missing from the objectionable pleading makes the preliminary objection in the nature of a demurrer an impermissible "speaking demurrer."

*Mobley v. Coleman*, 65 A.3d 1048 (Pa. Cmwlth.2013). There is, however, a limited exception to this rule:

> A limited exception to this general prohibition is recognized where a plaintiff avers the existence of a written agreement and relies upon it to establish his cause of action. In such a case, a defendant may properly annex that agreement without creating an impermissible speaking demurrer since the agreement

is a factual matter arising out of the complaint itself.

*Martin,* 556 A.2d at 971.

HAP attaches two exhibits to its preliminary objections (Exhibits B and C), which do not appear and are not referenced in Hospitals' Petition. The first is the Amended Letter Agreement, discussed above. HAP and DPW contend that this letter superseded the July 6, 2010 DPW/HAP Letter Agreement, upon which Hospitals base their claim in Count I of the Petition. For purposes of ruling on a demurrer to Count I, we must accept as true the allegations in the Petition. Whether the DPW/HAP Letter Agreement on which Hospitals rely has been superseded by the Amended Letter Agreement is an additional fact that we cannot consider at this stage of the pleadings. HAP's request that we consider it now does not fall within the limited exception to the "speaking demurrer" set forth in *Martin.* Accordingly, we will not consider Exhibit B to HAP's preliminary objections.

The second is the CMS Waiver Letter, discussed above. In this letter, CMS purports to conclude that the Assessment is generally "redistributive." HAP contends that this letter controverts Hospitals' claim in Count III that the redistribution scheme set forth in the HAP/MCO Agreement violates 42 C.F.R. § 433.68. The existence and legal effect of the CMS Waiver Letter, however, are collateral to the allegations in the Petition. They are not issues properly raised at this stage of the pleadings. HAP's request that we look to the CMS Waiver letter as a basis to sustain its demurrer to Count III of the Petition does not fall within the limited exception to the "speaking demurrer" set forth in *Martin.* Accordingly, we will not consider Exhibit C to HAP's preliminary objections.[8]

## B. DPW—Exhaustion of Administrative Remedies

■ In its brief, DPW argues that Hospitals have an exclusive statutory remedy to raise the issues raised in their Petition, pointing specifically to 67 Pa.C.S. § 1102(a), which provides: "A provider that is aggrieved *by a decision* of the department regarding the program may request a hearing before the bureau in accordance with this chapter." (Emphasis added.) Hospitals counter that this statutory remedy is directed toward "decisions" that are quasi-adjudicative in nature. Hospitals argue that they do not seek to challenge a particular decision by DPW, but rather challenge certain acts, or failures to act, by DPW in implementing Act 49 generally. According to Hospitals, challenges to agency actions that are regulatory, or legislative, in nature do not fall within the scope of Section 1102(a).

---

8. In a supplemental memorandum in support of its preliminary objections, DPW provided the Court with a copy of a DPW adjudication, purportedly resolving the Base Rate Appeal of Petitioner Armstrong County Memorial Hospital (Armstrong Hospital). In the supplemental memorandum, DPW contends that the issue of whether the DPW/HAP Letter Agreement constituted an impermissible delegation of authority was resolved adversely to Armstrong Hospital. Citing this Court's decisions in *Yonkers v. Donora Borough,* 702 A.2d 618 (Pa.Cmwlth.1997), and *Cytemp Specialty Steel*

*v. Workers' Compensation Appeal Board (Crisman),* 39 A.3d 1028 (Pa.Cmwlth.), *appeal denied,* —— Pa. ——, 50 A.3d 127 (2012), DPW argues that, as a consequence, Armstrong Hospital should be precluded from relitigating that question in Count I of the Petition. Because, however, the issue of whether Hospitals are barred by legal precedent relating to issue and/or claim preclusion was not raised by either HAP or DPW in their preliminary objections, that issue is not currently before the Court and thus will not be addressed in this opinion.

We agree with Hospitals that the statutory remedy under Section 1102(a) is intended to provide an administrative appeal remedy to address decisions by DPW affecting a particular provider or even a group of providers. *See, e.g., Julia Ribaudo Senior Servs. v. Dep't of Pub. Welfare,* 600 Pa. 641, 969 A.2d 1184 (2009) (statutory remedy applied where provider challenged adverse findings in DPW audit). Our interpretation is confirmed by language in the statute which provides that the time period within which a provider must request a hearing runs from the date of notice of agency action to the adversely affected provider. 67 Pa.C.S. § 1102(b).

Here, Hospitals do not challenge a particular decision by DPW affecting their rights as providers based on notice given to them by DPW. We agree that Hospitals' claims in the Petition are targeted toward action or inaction by DPW that is regulatory/legislative (not adjudicatory)[9] in nature. Such disputes are appropriately addressed to this Court's original jurisdiction. *See Nat'l Solid Wastes Mgmt. Ass'n v. Casey,* 135 Pa.Cmwlth. 134, 580 A.2d 893, 897 (1990). Because Hospitals' claims in this action do not fall within the class of disputes captured by Section 1102(a), we overrule DPW's preliminary objection based on failure to exhaust a statutory remedy.[10]

### C. DPW—Demurrer to Count III

In its preliminary objection in the nature of a demurrer directed to Count III of the Hospitals' Petition, DPW raises the issue of whether this Court should entertain a claim by Hospitals that DPW has implemented the Assessment in violation of the CMS approval of the amendments to the State Plan and/or 42 C.F.R. § 433.68. Based on DPW's brief in support, the objection appears to be based on DPW's contention that the federal government, and not this Court, should decide this question.

DPW observes: "Certainly, Petitioners are not suggesting that this Honorable Court can conduct judicial review of CMS' decision." (DPW Br. at 11.) We do not read Count III of Hospitals' Petition as presenting such a claim to us. Instead, Hospitals seek to invoke this Court's original jurisdiction to decide the question of whether DPW's implementation of Act 49, as alleged in the Petition, violates federal approval already received and federal law. Accordingly, because we do not interpret Hospitals' Petition as an appeal or challenge to a decision by a federal agency, we overrule DPW's preliminary objection to

---

**9.** *See* 55 Pa.Code § 41.3 (DPW hearing regulation defining "agency action" as "[a]n *adjudicative action* of the Department or a program office that relates to the administration of the MA Program" (emphasis added)).

**10.** Hospitals' claims also do not fall within the scope of the statutory remedy set forth in Section 810–G of the Code, which provides for administrative review of "a determination of [DPW] as to the amount of the assessment due … or a remedy imposed pursuant to [S]ection 809–G." Hospitals are not challenging in this action the amount of the Assessment or a remedy imposed pursuant to Section 809–G of the Code. Also, we reject DPW's contention that Hospitals' decision to appeal

DPW's determination of Hospitals' new APR–DRG base rate effective July 1, 2010, for fee-for-service medical assistance payments under Section 443.1(1.1) of the Code, compels the conclusion that Hospitals have an administrative remedy that they failed to exhaust with respect to the claims in the Petition. In that administrative appeal, Hospitals are unquestionably challenging a decision by DPW that falls within the scope of an administrative appeal remedy. Though Hospitals' claims in the Petition have some connection to the new APR–DRG base rates, for the reasons set forth above, the claims in the Petition do not fall within the scope of the administrative appeal remedy in Section 1102(a).

Count III of the Petition in the nature of a demurrer.

### D. HAP—Demurrer to Count I

■ HAP argues that Hospitals fail to allege in their Petition a valid claim for a violation of Article II, Section 1 of the Pennsylvania Constitution.[11] The gist of HAP's argument is that despite Hospitals' contention that DPW delegated ratemaking authority to HAP in the DPW/HAP Letter Agreement, the facts as set forth in the Petition, including the attached letter, do not support the claim. Hospitals respond by pointing to the DPW/HAP Letter Agreement and other documents attached to their brief in opposition to the preliminary objections, repeating their contention that all of the documents support their claim that "DPW impermissibly delegated to HAP the authority to redistribute the monies collected and distributed under the ... Assessment." (Hospitals' Br. at 10.)

Although Hospitals clearly oppose the DPW/HAP Letter Agreement, the question presently before the Court is whether they have articulated a violation of Article II, Section 1 of the Pennsylvania Constitution. The crux of Hospitals' claim in

Count I is set forth in paragraph 52 of the Petition, which provides:

> 52. The Letter of Agreement between DPW and HAP that allowed HAP to negotiate and implement "pass through" payments with the ... MCOs (through the ... MCO Coalition), as is set forth above, violates Article II, Section 1 of the Pennsylvania Constitution which prohibits the impermissible delegation of ratemaking authority to private entities.

Upon review of the allegations in the Petition and the copy of the DPW/HAP Letter Agreement upon which Hospitals base their claim (Affidavit Ex. 3), we agree with HAP that the Petition is deficient.

Specifically, the DPW/HAP Letter Agreement does not vest in HAP any authority to make any ratemaking decisions. The letter is written *by* DPW and *addressed to* HAP. The first paragraph sets forth the purposes of the letter:

> This letter of agreement regards the hospital fee-for-service, supplemental, and managed care enhanced payments pursuant to the Public Welfare Code Amendment and the process by which the hospital community through [HAP]

---

11. We recently expounded on the meaning of this constitutional provision:

Article II, Section 1 of the Pennsylvania Constitution vests legislative power in a General Assembly. Legislative power is the power to make a law and, thus, the General Assembly "cannot constitutionally delegate the power to make law to any ... other body or authority." *Blackwell v. State Ethics Commission*, 523 Pa. 347, 359–60, 567 A.2d 630, 636 (1989). However, it can "make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Bell Telephone Co. of Pennsylvania v. Driscoll*, 343 Pa. 109, 114, 21 A.2d 912, 914 (1941) (quoting *Locke's Appeal*, 72 Pa. 491, 498 (1873)). The legislature must make the basic policy choices, but it can "impose upon others the

duty to carry out the declared legislative policy in accordance with the general provisions" of the statute. *Chartiers Valley Joint Schools v. County Board of School Directors of Allegheny County*, 418 Pa. 520, 529, 211 A.2d 487, 492 (1965) (quoting *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 342, 54 A.2d 277, 284 (1947)). In that situation, "it is the legislature which has legislated and not the administrative body." *Bell Telephone*, 343 Pa. at 114, 21 A.2d at 915.

When conferring power on an agency to decide the facts and apply the law to a particular situation, the legislature must establish the standards for exercising that power.

*MCT Transp. Inc. v. Phila. Parking Auth.*, 60 A.3d 899, 904–05 (Pa.Cmwlth.2013) (en banc) (footnote omitted).

*will work with* [*DPW*] to achieve necessary federal approvals. I would appreciate it if you could countersign the letter and return it to me at your earliest convenience.

(Emphasis added.) The letter goes on to provide that no payments will be made to hospitals or MCOs under the Act 49 amendments to the Code until DPW receives the necessary federal approvals. The letter then provides:

DPW will *consult with* the hospital community through HAP on any changes that need to be made to the fee-for-service or managed care payment systems or the . . . Assessment pursuant to CMS requirements or to receive requisite CMS approvals. The *consultation process* will include the provision by HAP of alternative approaches and comments to effectuate the Public Welfare Code Amendment. In addition, DPW will include HAP in appropriate meetings with CMS.

(Emphasis added.) The balance of the letter goes on to outline a plan for implementation of Act 49. In several instances, the letter provides for DPW consultation with HAP on certain aspects of the implementation and contemplates efforts by HAP and DPW to reach agreement on other items.

We, however, see nothing in the DPW/HAP Letter Agreement that could be construed as an abdication by DPW of its statutory obligation to implement the Act 49 amendments to the Code to a private party, HAP. Indeed, while Hospitals refer to the DPW/HAP Letter Agreement generally as including a constitutionally offensive delegation, they cite to no particular portion of the document where the delegation occurs. By contrast, our review of the document reveals it to be merely an agreement between DPW and HAP as to how the Act 49 amendments to the Code, par-

ticularly redistribution of the Assessment dollars, would be handled *by DPW.* Rather than delegate authority to HAP, the document reflects an effort by DPW to gain HAP's input on and support for DPW's implementation plan.

That DPW would seek HAP's input on such a major new initiative affecting hospitals in the Commonwealth is not unconstitutional. That DPW would agree to consult with HAP and involve HAP in DPW's dealings with CMS also is not constitutionally offensive. Engaging stakeholders *before* implementation of a new regulatory scheme, particularly one that imposes a new tax, can be beneficial for many reasons, not the least of which is the potential to avoid later court challenges. It could also be helpful in seeking CMS approval *if* DPW can show that a state trade association representing most (if not all) of the affected hospitals in the Commonwealth agreed to DPW's State Plan amendments for implementation of the Assessment and distribution of the proceeds.

Accordingly, because we do not see anything in the DPW/HAP Letter Agreement that could support any claim for a violation of Article II, Section 1 of the Pennsylvania Constitution, we will sustain HAP's preliminary objection and dismiss Count I of the Petition.

### E. HAP—Demurrer to Count II

 In Count II of the Petition, Hospitals acknowledge that before it could implement Act 49, DPW was required to obtain CMS approval of the State Plan amendments. In paragraph 23, Hospitals acknowledge that DPW received approval of the State Plan amendments (Exhibits 5 and 6 to the Affidavit), authorizing, *inter alia,* collection of the Assessment and distribution of the proceeds. Hospitals contend, however, that the terms of the HAP/MCO Agreement, addressing how MCOs

will distribute—*i.e.,* "pass through"—to hospitals the enhanced capitation payments that the MCOs receive from DPW, violates the CMS-approved State Plan amendments.

In its preliminary objection, HAP contends that there is no provision in the CMS-approved State Plan amendments that provides for how MCOs must account for the enhanced capitation payments that they receive from DPW. In response, Hospitals direct the Court to paragraphs 24 and 25 of their Petition. Hospitals contend that the "pass through" methodology for enhanced capitation payments set forth in the HAP/MCO Agreement was the same methodology that was originally set forth in the DPW/HAP Letter Agreement and that CMS ultimately rejected. (Pet. ¶ 25.) CMS would not approve a plan that dictated how MCOs were to distribute the enhanced capitation payments to hospitals. Instead, as pled in the Petition, "CMS would only approve a plan whereby DPW would require that the . . . MCOs demonstrate that they had utilized all of their funding to increase payments to hospitals for inpatient services and had not kept any of the additional funding for themselves." (Pet. ¶ 24.) Hospitals, in essence, contend that DPW was complicit in a scheme with HAP and the MCOs to do an "end run" around CMS's *disapproval* of the original "pass through" scheme, by allowing, either affirmatively or tacitly, HAP and the MCO Coalition to agree to implement that scheme on their own.

We believe that Hospitals have pled sufficient facts to support a claim in Count II of the Petition that DPW may have, through some indirect means, been able to impose on MCOs the manner in which the MCOs were to distribute the enhanced capitation payments MCOs receive from DPW to hospitals under the Act 49 amendments to the Code. If proven, such allegations of fact may entitle Hospitals to a judicial declaration that DPW has acted contrary to the CMS-approved State Plan amendments. At this preliminary stage of the proceedings, we cannot say that Hospitals' claim is completely without merit. Accordingly, we will overrule HAP's preliminary objection to Count II of the Petition.

### F. HAP—Standing as to Count II

 HAP also challenges Hospitals' standing to contest DPW's compliance with the CMS-approved State Plan amendments. It appears undisputed that Hospitals have provider agreements with DPW to provide health care services to patients covered under the managed care portion of DPW's Medicaid program. It also appears undisputed that Hospitals have contracts with certain MCOs, through which Hospitals are paid for the services they provide to Medicaid recipients. Moreover, it appears undisputed that Hospitals were intended beneficiaries of Act 49, through implementation of the APR/DRG system and the distribution of proceeds from the Assessment. Hospitals, therefore, clearly have an interest in ensuring that the Act 49 amendments to the Code are implemented lawfully that goes beyond "the abstract interest of the general citizenry in having others comply with the law." *Hospital & Healthsystem Ass'n of Pa. v. Commonwealth,* 997 A.2d 392, 397 (Pa.Cmwlth. 2010) (en banc). Accordingly, we will overrule HAP's preliminary objection, challenging Hospitals' standing to pursue Count II of the Petition.

### G. HAP—Demurrer to Count III

 HAP claims that Hospitals have failed to plead sufficient facts to warrant a conclusion that the restrictions in 42 C.F.R. § 433.68 are being violated because the Assessment imposed by DPW is not

imposed uniformly.[12] In response, Hospitals direct us to paragraphs 3 through 39 of the Petition, wherein they allege a number of problems with the Assessment methodology.

The standard for determining whether a health care-related tax is "uniformly imposed" is set forth in the regulation:

(d) *Uniformly imposed health care-related taxes.* A health care-related tax will be considered to be imposed uniformly even if it excludes Medicaid or Medicare payments (in whole or in part), or both; or, in the case of a health care-related tax based on revenues or receipts with respect to a class of items or services (or providers of items or services), if it excludes either Medicaid or Medicare revenues with respect to a class of items or services, or both. The exclusion of Medicaid revenues must be applied uniformly to all providers being taxed.

(1) A health care-related tax *will be considered to be imposed uniformly* if it meets *any one of the following criteria:*

(i) If the tax is a licensing fee or similar tax imposed on a class of health care services (or providers of those health care items or services), the tax is the same amount for every provider furnishing those items or services within the class.

(ii) If the tax is a licensing fee or similar tax imposed on a class of health care items or services (or providers of those items or services) on the basis of the number of beds (licensed or otherwise) of the provider, the amount of the tax is the same for each bed of each provider of those items or services in the class.

(iii) If the tax is imposed on provider revenue or receipts with respect to a class of items or services (or providers of those health care items or services), the tax is imposed at a uniform rate for all services (or providers of those items or services) in the class on all the gross revenues or receipts, or on net operating revenues relating to the provision of all items or services in the State, unit, or jurisdiction. Net operating revenue means gross charges of facilities less any deducted amounts for bad debts, charity care, and payer discounts.

(iv) The tax is imposed on items or services on a basis other than those specified in paragraphs (d)(1)(i) through (iii) of this section, e.g., an admission tax, and the State establishes to the satisfaction of the Secretary that the amount of the tax is the same for each provider of such items or services in the class.

(2) A tax imposed with respect to a class of health care items or services *will not be considered to be imposed uniformly if it meets either one of the following two criteria:*

(i) The tax provides for credits, exclusions, or deductions which have as its purpose, or results in, the return to providers of all, or a portion, of the tax paid, and it results, directly or indirectly, in a tax program in which—

(A) The net impact of the tax and payments is not generally redistributive, as specified in paragraph (e) of this section; and

---

**12.** For purposes of this preliminary objection, as noted above with respect to HAP's "speaking demurrer," we will not consider any of HAP's arguments in support of dismissal based on the CMS Waiver Letter.

(B) The amount of the tax is directly correlated to payments under the Medicaid program.

(ii) The tax holds taxpayers harmless for the cost of the tax, as described in paragraph (f) of this section.

(3) If a tax does not meet the criteria specified in paragraphs (d)(1)(i) through (iv) of this section, but the State establishes that the tax is imposed uniformly in accordance with the procedures for a waiver specified in § 433.72, the tax will be treated as a uniform tax.

42 C.F.R. § 433.68(d) (emphasis added). Thus, to qualify as a uniformly-imposed tax, the tax must satisfy at least one of the (d)(1) criteria and not satisfy either of the (d)(2) criteria. But even if the tax does not satisfy one of the (d)(1) criteria, CMS may still approve it if the state can show that the tax is imposed uniformly.

Though Hospitals raise several claims about the problems with the Assessment methodology, they fail in their Petition and the brief in opposition to the preliminary objections to aver how any of these deficiencies violate the standards for uniformity imposed by the regulation. We are unable to correlate any of the deficiencies in the Assessment methodology that Hospitals allege to any of those criteria. Therefore, we agree with HAP that Hospitals have failed to state a claim that the Assessment violates the uniformity requirement set forth in 42 C.F.R. § 433.68. Accordingly, we will sustain HAP's preliminary objection and dismiss Count III of the Petition.[13]

## H. HAP—Demurrer to Count IV

■ In Count IV of the Petition, Hospitals contend that Act 49 violates Article I, Section 17 of the Pennsylvania Constitution, because it essentially precludes Hospitals from benefitting from acceleration clauses in their existing contracts with MCOs, which would require the MCOs to increase the reimbursements to the Hospitals whenever DPW increases Hospitals' fee-for-service base rate. According to Hospitals, the MCOs with whom they contract have taken the position that Act 49 allows them to continue to reimburse the Hospitals based on the fee-for-service base rates that were in effect prior to the passage of Act 49, notwithstanding the acceleration clauses in the contracts.

In their brief in opposition to the preliminary objections, Hospitals direct the Court to Section 443.1(1.2)(i) of the Code as the allegedly offensive provision. This part of the Code, added by Act 49, provides:

(i) For inpatient hospital services provided under a participation agreement between an inpatient acute care hospital and a medical assistance managed care organization in effect as of June 30, 2010, the medical assistance managed care organization shall pay, and the hospital shall accept as payment in full, amounts determined in accordance with the payment terms and rate methodology specified in the agreement and in effect as of June 30, 2010, during the term of that participation agreement. If a participation agreement in effect as of June 30, 2010, uses the department fee for service DRG rate methodology in determining payment amounts, the med-

---

13. Because we are sustaining the preliminary objection in the nature of a demurrer directed to Count III of the Petition, we will not address HAP's preliminary objection, challenging the Hospitals' standing to assert that claim. If we did, however, we would likely conclude, as we have with respect to Count II, that Hospitals have standing to assert Count III.

ical assistance managed care organization shall pay, and the hospital shall accept as payment in full, amounts determined in accordance with the fee for service payment methodology in effect as of June 30, 2010, including, without limitation, continuation of the same grouper, outlier methodology, base rates and relative weights, during the term of that participation agreement.

Hospitals contend this language allows MCOs to lock in the pre-Act 49 fee-for-service DRG rates.

In support of its preliminary objection, HAP directs this Court to two provisions in the same paragraph. First, Section 443.1(1.2)(vi) provides that nothing in paragraph (1.2) would preclude MCOs and hospitals from entering into new agreements or amending existing agreements to provide for payment terms different from those set forth in Section 443.1(1.2)(i)-(iv). Second, Section 443.1(1.2)(ii) provides:

> (ii) Nothing in subparagraph (i) shall prohibit payment rates for inpatient acute care hospital services provided under a participation agreement to change from the rates in effect as of June 30, 2010, *if the change in payment rates is authorized by the terms of the participation agreement between the inpatient acute care hospital and the medical assistance managed care organization.*

(Emphasis added.) HAP contends that both of these provisions preclude any claim by the Hospitals that Section 443.1(1.2)(i) constitutes an unconstitutional impairment of contract.

With respect Section 443.1(1.2)(vi), Hospitals acknowledge that the provision allows hospitals and MCOs to enter into new agreements or to amend existing agreements that would adopt the new, and more favorable, rate methodology for hospital reimbursements. Hospitals contend, however, that the MCOs have no incentive to enter into such negotiations, because it would mean that the MCOs would have to pay more to the Hospitals than they are currently required to pay under Section 443.1(1.2)(i).

Hospitals, however, do not address Section 443.1(1.2)(ii) in their brief in opposition. We agree with HAP that this particular provision preserves the enforceability of so-called "acceleration" clauses of the type HAP describes in its Petition. Whether and to what extent the MCOs are in breach of their contracts with Hospitals by refusing to abide by the acceleration clauses is not a matter before this Court. In terms of Count IV of the Petition, however, we are not convinced that any provision in Section 443.1(1.2) can reasonably be construed as nullifying, *ex post facto*, Hospitals' rights to enforce the acceleration provisions of their MCO contracts in effect as of June 30, 2010. Accordingly, we will sustain HAP's preliminary objection and dismiss Count IV of the Petition.

### III. CONCLUSION

For the reasons set forth above, we will overrule DPW's preliminary objections. We will, however, sustain HAP's preliminary objections in the nature of a demurrer to Counts I, III, and IV of Hospitals' Petition, and those counts will be dismissed. We will overrule the balance of HAP's preliminary objections and direct the parties to file an answer to the remaining count (Count II) of the Petition.

Judge LEADBETTER did not participate in the decision of this case.

### *ORDER*

AND NOW, this 20th day of May, 2013, the preliminary objections of Respondent Department of Public Welfare of the Commonwealth of Pennsylvania (DPW) are

hereby OVERRULED. The preliminary objections of Intervenor Hospital and Healthsystem Association of Pennsylvania (HAP) in the nature of a demurrer directed to Counts I, III, and IV of the Petition for Review are hereby SUSTAINED and those counts are DISMISSED. The remaining preliminary objections of HAP are hereby OVERRULED.

DPW and HAP are directed to file an answer to the remaining claim in the Petition (Count II) within twenty (20) days of the date of this Order.